We now have certain underwriters at Lloyds v. 3131 Veterans Blvd, 2312-68. Mr. Wise. Sure. Good morning, Your Honor. Opposing counsel, I think, just stepped out for a moment. Oh, well, okay. We won't proceed. Everybody's got the same needs. I apologize. No worries. Everybody set here? Thank you. Good morning, Your Honors. May it please the Court. My name is Samuel Wise, and I represent petitioner's appellants, the insurers. This is a simple case about delegation that the District Court got wrong. That issue is easy, and the Court can rule in the insurer's favor on delegation, and that ends this case. But even if the panel disagrees with us on delegation, the Stevens issue is also well presented, and this panel should bring the Second Circuit in line with the Supreme Court's guidance in Medellin, as well as four of its sister circuits and the U.S. government's position, which the Supreme Court instructs in this circuit is recognized, receive great weight. I'm puzzled by the argument that the delegation issue is simple. I know that our case law says that parties can agree to delegate to the arbitrators the questions of arbitrability, and that's fine. But if the state statute is effective and applicable, it says there are no arbitrators. Sure. But what the Supreme Court says in Renaissance is that in order to make use of that challenge, the party resisting arbitration has to challenge the delegation provision specifically. And what my friends on the other side have done is not done that. They've argued, I think, what you just said, Judge Lynch, which is that the entire arbitration provision is invalid. Does the case law really distinguish between the delegation provision and the arbitration clause? I understand the law to be that if you're challenging the legitimacy of the underlying contract, that's not good enough to get you out from under the arbitration provision. But if the arbitration provision is invalid, why doesn't that be specific to the delegation clause? I'm not sure that that's really a distinction that's made in Renaissance. Because that's what the Supreme Court says in Renaissance, Your Honor. The kind of theory that Your Honor just articulated is really found within Justice Breyer's dissent there, where he says that it doesn't quite make sense to us that if you challenge basically the arbitration provision as a whole, that includes a challenge to the delegation provision. And what the Supreme Court says, and it's clear, is that you need to challenge the precise agreement to arbitrate. And over here, what we asked the district court to do in 3131— And where does that rule come from? Does that rule come from the FAA? I mean, what law is it that the Supreme Court is relying on in drawing that conclusion? So I think that the Supreme Court is relying on its previous cases. I know that, but I mean, what is the origin? There are rules that come from state law. There are rules that come from federal law. There are rules that are federal common law. There are rules that are statutory. So isn't all of this a creature of the FAA and the interpretation of how the FAA is to be interpreted that lies at the origin of the rules about delegation clauses and when you can challenge arbitration provisions? Those aren't state law things. No, they're not. It's the FAA and federal common law. Then what if the FAA is not applicable here? I'm not sure that that matters. The Supreme Court in Renison articulated a bright-line rule. It didn't distinguish. It said that when you have an arbitration provision that you're challenging, in order to get at the delegation provision—no one's disputing here that this arbitration provision assigns to the arbitration panel, all matters in dispute. This Court has said all means anything and everything. Right, but if that rule derives from the Federal Arbitration Act, and the Federal Arbitration Act is inapplicable to state insurance contracts, then what is the basis for that rule? The rule finds its root in the FAA, and the FAA simply does not exist for purposes of this case. I'm not quite sure that that's correct, Your Honor. I think that what happens is that the arbitration panel is presented with these arguments about whether or not Louisiana law reverse preempts, through the MFA, the arbitrability under the FAA. My friends on the other side are free to present that issue to the arbitration panel, but if they wanted to ask the Court to rule that delegation is not valid under this Louisiana statute, then they needed to do that below, and they didn't. You didn't invoke the—I mean, what's interesting is that there's really no discussion about the delegation clause below, and so they don't articulate a delegation clause-specific challenge, although even Renneson recognized that the same grounds that you might use to challenge the arbitration agreement as a whole might be the grounds that you would use to challenge the delegation provision, which I gather is the case here, right? We're looking at the same statutory and validity—argued statutory and validity under Louisiana law. So, why— why would we hold them to not have raised it? When you never invoked the delegation clause below, it said, no, Court, you can't decide this arbitrability question. You're arguing the merits as to the arbitrability, but you didn't say no because of this delegation clause. So I will concede that this wasn't raised below in Empire, but it was in 3131, and that was the first case that was decided. So in the briefing below in front of Judge Preska, we argued to Judge Preska that the arbitration panel needs to decide arbitrability, and Judge Preska, in her decision below, she blew right through it. She just totally ignored the issue. And to the extent that the panel wants to differentiate, I think, between Empire and 3131, for starters, my friends on the other side haven't argued that, so I think they might have waived the waiver argument, but even if the panel is going to distinguish on those two cases, all that brings you to is Stevens, and then Empire needs to be decided under Stevens, even if this panel can reverse 3131 on the basis of delegation. Should we wait for the Supreme Court of Louisiana to act on this police jury case? I don't think so, Your Honor. Number one, I don't know how long it's going to take. Number two, I think that, you know, as much as it pains me to say this, I think that the Second Circuit is bound by scab, you know, under factors. And scab is clear that this statute does not allow arbitration provisions in surplus lines contracts. I don't agree with scab. There's a petition en banc that's pending that hasn't been ruled on. You know, in some ways, Louisiana is a bit of a jurisdictional mess. And these issues about arbitrability and, quite frankly, the Stevens issue are both issues that this panel can decide independent of however the Louisiana Supremes or the Fifth Circuit ultimately come out on in 1968. So if you don't knock it out, or if you don't get it on the arbitrability issue, like who decides the arbitrability issue, or on the Stevens question, at this point you're acknowledging that once we're looking at Louisiana law, you lose. I think that as the law exists currently, that's correct. I think that there's a petition en banc pending in front of the Fifth Circuit. I think that if they take it up, we will quickly file a 28-J letter. But I agree that factors, I think at this point, compels the court to go with scab. And I see that I'm almost, actually I'm over time. On the Stevens point, I just wanted to touch on that quickly. Which is that, you know, the court, the Second Circus decision in Stevens is almost 30 years old. And in that time, four courts of appeal have ruled, slightly different reasons acknowledging that, but have ruled that the convention takes precedence over the MFA. And therefore, this 868 law wouldn't apply. And more importantly, the Supreme Court in Medellin provides what a court in this circuit is called a clear bright line rule for what constitutes a self-executing or a non-self-executing treaty. A self-executing treaty is one that says that a court shall do something. Shall means must, obligatory, no way around it. And at least some of those circuits that have disagreed with Stevens did so after Medellin and explicitly invoking Medellin as one of the reasons for why they shouldn't follow our precedent. Exactly, Your Honor. I think that all of the decisions invoked Stevens in some way. The Fifth Circuit and the Fourth Circuit went slightly different direction on the self-executing. But even Judge Clement in the Fifth Circuit was not reconcilable with Medellin. And if you talk about just interpretation of a treaty, the Supreme Court has sort of set out what the rules are. And we're not asking the court to find that the entire convention is self-executing. Obviously that's not the case. We only need Article 2, Section 3, Your Honor. And that one says that a court of a contracting state shall refer a matter to arbitration. And putting aside delegation arbitrability and putting aside 868, this court is out of step with its sister circuits. It's out of step with the Supreme Court. And in the context of treaties, this court and the Supreme Court have both recognized that the government's position is entitled to great weight. Sorry, Your Honor. No. And in the Fifth Circuit case, it went up to SCOTUS. The Supreme Court sought the Solicitor General's views. And the Solicitor General came back with a brief that said, number one, the convention is self-executing. Number two, the MFA doesn't apply to the convention anyway. And then it went up again on CLMS, which is the Ninth Circuit case. And that's the one that found that the convention is self-executing. And the Supreme Court denied cert. Now, you know, it's hard to kind of read tea leaves about what the justices will take up or won't take up. We're not supposed to read tea leaves about cert petitions. But your point is, your primary point is we are supposed to heed the executive branch. And the executive branch has taken a position favorable to you with respect to the treaty. That's correct, Your Honor. You know, the question. But on the other hand, you do concede that absent a conclusion that Stevens has been irredeemably undermined, we are presumptively bound by that decision. And we either have to determine that it's so undermined by the Supreme Court case that the precedent's been centrally abrogated or we have to go in bank and address it that way. So I'm not sure that the court has to go that far in either direction. I think that if you look at page 21 of our brief on the 3131 case, we talk about, you know, how the intervening precedent from the Supreme Court can be subtle. I don't think it's subtle here. I think it's full-throated, right? The Supreme Court is very clear. This is what constitutes a self-executing treaty. This is what constitutes a treaty that is not self-executing. And if you look at Stevens, it's not like, you know, there's a tremendous amount of analysis there. It quotes from Foster v. Nielsen, which is a 1829 Supreme Court case, which Medellin quotes also. And which Medellin relies on to distinguish between sort of what is a self-executing treaty and what is not a self-executing treaty. What about the argument, though, that the treaty requires that it be referred to arbitration if it concerns a subject matter capable of settlement by arbitration? And until the state, the member state has, not the US state, but the member state of the convention, has identified what subject matter is capable of settlement by arbitration, the provision that you're focused on can't really take effect. And the place in which that determination was made, that this applies to commercial contracts, was in the FAA, which is exactly what's reverse preempted by the Ferguson Act. Sure. So I have two answers to that. I think, number one, it's a bit of a chicken and egg issue, right? Because if you rule that the treaty is self-executing, then the treaty takes precedence over the MFA, which takes precedence over the Louisiana statute, which means that it is capable. But I also think that we're not, when we talk about states here, we're not talking about states of the United States of America. We're talking about countries. And the types of agreements which are not capable of being performed by arbitration are the types of things that are found at the end of Article II, Section 3, null and void and operative and capable of being performed. And for that, you look to federal common law. You look at those types of defenses to arbitration or defenses to contract that can be applied on an international scale. The whole point of the convention and the whole point of this reliability of international contracts and international arbitration provisions is so that you don't end up with these sort of parochial state interests taking precedence over the United States' desire to have arbitration agreements enforced. So if the convention, because this is helpful, I was trying to figure out why all roads don't lead us back to Louisiana anyway. Let's assume that we're applying the convention and then we're trying to figure out, okay, does this concern a subject matter capable of settlement by arbitration? I would have thought we looked to the FAA for that, but we can't because that is reverse preempted and so I'm not sure what the answer is to that. But then there's the, and you referred unless it's null, void, and operative are capable of being performed. And what you're saying is that in figuring out whether it's null and void, we're not applying, there's not some international common law that tells us what's null and void. So your view is that that null and void must be under the what I'm going to call federal level common law of each member state rather than the applicable null and void law of the jurisdiction in which the case is being litigated? Exactly, Your Honor. And why is that? Admittedly, I haven't found a Second Circuit case that says this, but I have from the 1st, 3rd, 4th, 5th, 10th, and 11th. All of which say some variation of the fact that the null and void component of the convention only applies to those that can be applied on an international scale. So we're talking like standard reach of contract offenses, fraud, mistake, duress, waiver. Not sort of a Louisiana law doesn't like arbitration, so therefore we're going to totally upend a treaty that the United States entered into with other countries, which needs to be applied and which, quite frankly, for the reliability of foreign commerce and commerce generally needs to be relied upon by parties who are coming to contract in the United States. My clients issued these policies with the knowledge that they would be able to arbitrate. They knew that they'd be able to do it in New York under a specific forum and law, and that's why they issued these policies. And they wouldn't have come to the U.S. to issue these policies to provide this insurance for Louisiana businesses had they not had the ability to rely on the convention and the ability to rely on the arbitration agreement as it says in the policy. But why federal common law? If the FAA had never been adopted, wouldn't there need to be some federal proclamation of what can be resolved by arbitration? I mean, what if, you know, we were in an alternate universe where we still were operating where courts, jealous of their own powers, said that we don't like these arbitration things, or maybe it's applicable to certain things but not to other things. Why doesn't it bring you back to the FAA as what tells us that practically anything is subject to arbitration? So I think that recognizes obviously that the FAA grew out of sort of this judicial hostility to arbitration, right? And we're not disputing that, but we do have the FAA. And more importantly, we have the convention. And what the case is applying the convention sort of on an international scale, right? I'm talking about Mitsubishi. I'm talking about Prima Paint. Those all talk about the importance of a uniform set of reliable standards by which international businesses will come and do business in the United States because they can rely on the arbitration provisions being enforced. So if we didn't have the FAA, yeah, sure, we probably wouldn't have much of the arbitration sort of jurisprudence that we have. But now that there's been this marked shift by Congress who recognizes the importance of arbitration both domestically and internationally, that's kind of just not the facts on the ground. That's a generalized thing that sort of supersedes whatever the effect of McCarran-Ferguson might be in a particular context of insurance. That's correct, Your Honor. That's the position you're taking. I understand it, I think. If no one has anything else, I will save everything else for rebuttal. Thank you, Your Honors. Good morning, Your Honors. William Balrus on behalf of my clients, 3131 Veterans and Empire Properties. Your Honor, my clients are property owners in Louisiana. Their properties were damaged by Hurricane Ida back in August of 2021. The insurers agreed to pay for damage to their property. The insurers paid, in one case, nine months later. In another case, ten months later, they paid about five to ten percent of what my client presented to them as the damage. And under Louisiana law, my client could sue them to get what they're owed contractually, but also for penalties and attorney's fees. They're allowed under Louisiana law. So they did that over two years ago, and we've been in this situation now for two years litigating this arbitration issue. And the reason that they want to arbitrate is because they want to make this as expensive as possible for my clients, and they want to make it as take as many rights from my clients that they're allowed under Louisiana law away, because it says it's going to be arbitrated under New York law. So they want my clients to pay more to get less. So before we get into the intersection of the convention and the Federal Arbitration Act and the McCarran-Ferguson Act and Louisiana Insurance Law, there's two issues that I want to bring up. One, I think is excellent news for you and your clerks if you want to find an easy solution to this. I suggest that Con Lucas tells us that, because the convention says it has to be an agreement in writing and signed by the parties. Or an exchange of telegrams or communication letters, right? That is correct. What about that piece of it? Isn't this the classic case of a contract that is created by communication back and forth? And I would just suggest none of that is in the record, Your Honor. I don't have the underwriting file. I know just from, in general, the way this works is usually clients of mine go to their insurance agent and they sign a contract saying this is what our property, we think it's worth, and we want insurance. And then it goes through a broker, and then it goes to insurance companies. But I don't have that underwriting file, because the litigation has stayed in Louisiana. They suggest that maybe that's out there, but this is not a situation where they sought to introduce that at the district court, and the judge said, nope, you can't introduce that, and they're saying there's an error of law that you need to correct. That's, for whatever reason, they chose not to put any of that in the record. So there's no record basis of telegrams or letters or anything like that. Haven't both we, independently in the Supreme Court, I don't know which was first, because I don't have the date here, but haven't we held that that signing requirement doesn't supersede existing equitable or other substitutes, such as equitable estoppel, so we couldn't just rely on the lack of signing without at least doing an equitable estoppel analysis? Yes, there are some cases that talk about that, and usually the equitable estoppel usually arises under the context of you have somebody who is affected by a contract, and they're not a signatory to it, but there is an underlying signed contract. So often if you have, so for example, my clients in this case bought these properties from former clients of mine, and it's not a situation where I'm saying, well, the buyers didn't sign the insurance contract, and that's why you can't do it. I'm saying neither the buyers signed it or the original insureds. No one signed it on the insured side. So I don't think the equitable estoppel applies because there's not an underlying signed agreement. What about this? I'm looking at our decision in the American Bureau of Shipping versus Tentera Shipyard, where we seem to sort of say if you're going to try to seek a benefit from the contract that includes this arbitration provision, that satisfies the equitable estoppel analysis. Well, I think that's one of the reasons why Louisiana law bans arbitration clauses, because otherwise insurance could just include these arbitration clauses, and if insureds objected to it, they'd say, well, all right, you don't have coverage anymore because you're challenging a piece of this. But Louisiana law specifically forbids that. And so I think it's a situation where- I thought you were offering us a path to decide this without dipping through Louisiana law. That's why I was raising that question. Well, I do think that you can rule this on the signing issue and that equitable estoppel would not apply because, again, I think that you have to have the underlying signed contract to get there. But those are my thoughts on Con Lucas. Unless you have further questions on those, I'll move along. So on the delegation issue, I think Your Honor brought up some very good points about this, that it has to go through the FAA, which is reverse preempted. But there is some language that I think is important from some of the cases that were cited by both of the parties. The Renner Center case says, if a party challenges the validity of the precise agreement to arbitrate an issue, the federal court must consider the challenge before ordering compliance with the agreement to arbitrate. And that's exactly what we did in this case when we challenged the signing of it. The Supreme Court in the Henry Schein case said in 2019, quote, to be sure before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. We're saying that doesn't exist in this case. And then in the Doctors Associates case, this court said, parties may not delegate to the arbitrator the fundamental question of whether they form the agreement to arbitrate in the first place. Well, doesn't that really go to the Cotton Lucas argument and the signature issue? Because that would go to that. But once we're – They are related. We're saying that it's – But what if we're past that for whatever reason and moving on to consider the enforceability of the arbitration clause and what it calls for? Is there any other reason why this is – the reason why this is invalid are either the signature argument, which I suspect could be construed as something interesting and tricky in its own right, whether that is something that is for the court even if there is a valid delegation clause, or the argument that Louisiana law applies here and kicks out the arbitration clause altogether? That's the second reason. And the third reason is the one that Your Honor pointed out earlier about whether this is a matter capable of settlement by arbitration. And I can speak to that in a few moments. But I do think that Louisiana law – I think it's uncontroversial that under McCarran-Ferguson, Louisiana insurance law reverse preempts the Federal Arbitration Act. The insurers have conceded that under SCAV it's clear now that Louisiana law forbids arbitration clauses in insurance contracts. And so – Surplus lines insurance. I must say, though, I understand that your clients already have signed up and already have gotten insurance and are arguing about what is the consequence of that. But I must say it seems like shooting the state in its own foot if – I mean, they make these arguments about the United States as a whole wanting international businesses to come here. These people only have insurance because there are foreign insurance companies who are prepared to take these risks. And as the coast disappears, the property owners are looking for insurers. And to sort of say the insurers are going to be governed by hostile Louisiana law is pretty much going to say they're not going to come and insure people. Well, in this case there are, I believe, 11 subscribing insurers, and the vast majority of them were United States insurers. They weren't – I think only maybe 12 percent of the risks were written by – I guess BAV was a domestic insurer as well, so I guess there are domestic insurers, too, who will play in that market. It's mainly domestic insurers, and they can't have arbitration clauses. Anyway, that's just a policy observation. It doesn't bear on what we have to decide. Well, so the question I think – the second point Your Honor brought up is this does turn on the self-executing question. And I know that the insurers contend that the Supreme Court has made a full-throated endorsement of self-execution, but they actually didn't do that. The full-throated endorsement would have been if they said in Medellin, look at Article 2 of the convention if you want to see what a self-executing treaty is. Instead, they pointed to the convention, the treaty, and talked about it not being self-executing, and they didn't parse between what part of it was and what part of it wasn't. So I suggest that there's not a full-throated endorsement of Article 2 being self-executing, and the Fourth Circuit and the Fifth Circuit agree with that. The Fourth Circuit in the ESAB case said in that case that the question of what constitutes – and this is post-Medellin – what constitutes a self-executing treaty is long, confused courts and commentators and is one of the most confounding in treaty law. And ultimately, they did not answer the question in that case. And I'd suggest the reason that Medellin doesn't answer it is because, one, it didn't say what they're saying it said about the convention. It actually – It doesn't say anything about the convention, right? I mean that's, I suppose, an argument with some force that Medellin doesn't by its terms abrogate Stevens. That's right. Because it's just not about that. It's about a different treaty. But it does give you a methodology where the Supreme Court has sounded fairly emphatic to me about how you're supposed to determine this. And I would suggest that what the Supreme Court thinks is best shown by what it does. And in that Medellin case, they did talk about the New York Convention, and they used it as an example of a treaty that was not self-executing. Now, they were talking about Article I instead of Article II. But they could have written one more sentence and said, if you want to see what a self-executing treaty is, look at Article II. And they declined to do that. And they have, in fact, said in other cases post that they've talked about the convention having implementing legislation. And so I would suggest that it's not clear. And, again, the Fourth Circuit agreed with that, and the Fifth Circuit did in the safety national case. They said on page 721, it's unclear to us whether the convention is self-executing. The Supreme Court indicated in dicta in Medellin that at least the provisions of the convention pertaining to the enforcement of judgments of international arbitrations are not self-executing. This could be read to imply the convention in its entirety is not self-executing. But they said they couldn't draw that conclusion based on that case. But they could have, if the Supreme Court meant that, they could have easily said that. So I would suggest that this is not a situation in which this court is on some island and all the other appellate courts are all saying this is self-executing. There's actually only two circuits that have said it's self-executing. This circuit said it's not, and two said we don't know. So the reasoning, I think, of Stevens I think is still good. And this court has obviously not overruled Stevens. I think Stevens still controls. I put in my papers, you know, one of my suggestions, which is that Article I says that it uses the word may in terms of what signatory nations can decide what the convention will apply to. And my suggestion would be that that necessarily required Congress to do something. And you don't even get to Article II about what happens about shall until Congress has decided to implement the treaty through the FAA of what it's going to apply to. And then there's finally this question, if you find that they don't lose on Con Lucas and you find that the treaty is self-executing, I would suggest that it's not a matter that's capable of settlement by arbitration. Because GE Energy in 2020, Supreme Court talked about the convention does not set out a comprehensive regime that displaces domestic law. And it relies on domestic law to fill in the gaps. And I would suggest that in the context of insurance, and I believe you already noted this, Judge Lynch, that if you look at domestic law, Congress has said that's up to the states. And in this case, the treaty would direct us to the McCarran-Ferguson Act, which would then direct us to Louisiana law, which clearly says that you can't have this arbitration clause in the policy. So those are my three reasons that I believe that the district court should be affirmed. It's not a signed writing. Stevens is still good law. And this is not a matter that is capable of settlement by arbitration. Thank you. Thank you, Your Honors. Mr. Williams. Pardon me. A couple of points. Starting with Medellin, I just don't think that the dicta in Medellin can be used to overrule its clear holding. Medellin talks about a different, as my friend on the other side has conceded, the dicta in Medellin talks about a different component of the convention, not the relevant provision here, which is Article 2, Section 3. And if you look at Medellin, that makes sense, right? The question in Medellin was how to interpret whether or not individual states within the United States have an obligation to give effect to rulings from the International Court of Justice. And the Supreme Court held that when it says that states will undertake to comply, states may do something, right, this type of sort of permissive language, that that doesn't make something self-executing and that that doesn't obligate courts to do anything. And then it compares it to the convention, which then had implementing legislation, because there are components of the convention, as I noted earlier, that say that Congress may do something, right? It allows Congress to implement legislation to give effect to the convention. But I don't think that my friend on the other side would dispute, and there are cases across the country that acknowledge that you can have a treaty with self-executing and non-self-executing components. So I just don't see a contradiction there. The other thing that I would note is that Henry Schein and Doctors Associates are both contract formation cases, right? And in Doctors Associates, which was written by you, Judge Lynch, the issue was whether or not Al-Amey, who agreed, received consideration in exchange for his agreement to arbitrate, right? That's obviously the type of core formation issue that the parties can never delegate away. What we have here is a question about whether or not the arbitration provision is valid. And the Supreme Court in Rena Center is very clear. Unless you challenge the delegation provision specifically, you send that to the arbitration panel. And that's what happened here, right? They didn't challenge the arbitration provision specifically below. They didn't challenge, sorry, the delegation provision below. They didn't challenge the delegation provision specifically up here. On the Conluca's point, I would note that at page 827 of the 3131 record, it does refer to the policy as being a renewal. So I do think that at least there, the panel could find that this document was exchanged. But to the extent that this presents a factual issue, it never reached the court below because the district court was bound by Stevens, much like I think we would argue that this court is bound by Medellin. So, of course, it wasn't raised below because there was no reason to raise it. If that's what this is going to turn on, then we would ask the court to rule in our favors on the Stevens issue and send it back down to the district court for fact finding on whether or not the arbitration provision was exchanged. Because I agree, that's not in the record. But I don't think it really needed to be. Can I just, your statement that they haven't argued here that the delegate, they haven't specifically targeted the delegation clause. In Rennes Center, we recognize that there are going to be times when the basis for the challenge to the broader doll in this series of nested dolls is the same as the change to the lesser. And I see in Kelly's brief, 3131 veterans showed the entire agreement to arbitrate, including the delegation clause, was invalid. And I'm just wondering whether that's an argument that's targeted at basically saying for all the same reasons the delegation clause is invalid. What more do they need to say? We don't like the delegation clause, and the delegation clause is itself invalid. I understand the hesitation from the panel, kind of why that may not make sense, right? And I think that that sort of would adopt Justice Breyer's dissent. But the majority for the Supreme Court on that decision is very clear that you have to say, I am challenging the delegation provision. It's not enough to say that I'm challenging the entire arbitration provision. Right, I'm just understanding for the same reasons that the whole agreement is invalid, so is the delegation clause. That is a, it's not the only challenge they make, but why isn't that a challenge to the delegation clause? Because there is no real- It's not fulsome enough? Among other things, sure. I think that number one, it's not fulsome enough, and number two, it buys into the argument that Jackson made in Renner Center, right? Which was that, the same thing, because I challenged the entire arbitration provision, therefore I must have also challenged the delegation provision. And the Supreme Court said that that's not enough. Right, okay. I don't know how to get past the explicit wording of the court in terms of what needs to be done to challenge the delegation provision. There's no argument here that the delegation provision isn't clear. There's no argument here that the delegation provision doesn't include validity. The policy is very clear about that. So what they need to do is they need to say Louisiana law prohibits delegating this to the arbitration panel, and they just don't do it. And I see that I'm over time, so I will conclude here. Appreciate it. Thank you all very much. Appreciate your time.